**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
------------------------------------------------------------------------X
JEFFREY LEIBSTEIN and ELENA LEIBSTEIN

Plaintiffs,

-v.-

LAFARGE NORTH AMERICA INC., LAFARGE
BUILDING MATERIALS, INC., one or more of which
d/b/a LAFARGE CORP., and THE HOME DEPOT, INC.

Defendants.

------------------------------------------------------------------------X

**MEMORANDUM & ORDER**
Civil Action No. 06-CV-6460

APPEARANCES:

**DANKNER & MILSTEIN, P.C.**
Attorneys for Plaintiffs
41 East 57th Street, 36th Floor
New York NY 10022
By:     Jay W. Dankner, Esq.

**GOODWIN PROCTER, LLP**
Attorneys for Defendants
901 New York Avenue, NW
Washington DC 20001
By:     Richard L. Matheny, III, Esq. (Pro Hac Vice)
        Kathryn Starnella, Esq.
        Amanda S. Hitchcock, Esq. (Pro Hac Vice)

**HURWITZ & FINE, P.C.**
Attorneys for Defendants
1300 Liberty Building
Buffalo NY 14202
By:     Harry F. Mooney, Esq.

**HURLEY, Senior District Judge:**

## I.  INTRODUCTION

Presently before the Court is a motion for summary judgment filed by defendants[1]

Lafarge North America Inc. ("Lafarge") and The Home Depot, Inc. ("Home Depot")

(collectively, "Defendants") pursuant to Federal Rule of Civil Procedure 56, and a cross-motion

for leave to amend their Complaint filed by plaintiffs Jeffrey Leibstein ("Leibstein") and Elena

Leibstein (collectively, "Plaintiffs") pursuant to Federal Rule of Civil Procedure 15.  Plaintiffs

seek recovery on the following three[2] causes of action: Strict Products Liability (Count I & V),

Negligence (Count II & VI), and Loss of Consortium (Count VIII).  Defendants' summary

judgment motion targets all three causes of action.  Plaintiffs oppose Defendants' motion and

cross-move for leave to amend their Complaint to allege violations of the labeling requirements

of the Federal Hazardous Substances Act ("FHSA"), 15 U.S.C. §§ 1261-1278 (2000).  For the

reasons stated below, both motions are DENIED.

## II.  BACKGROUND

The following facts are undisputed unless otherwise noted.  On November 28, 2004,

Leibstein purchased twelve ninety-four-pound bags of Type I Portland cement (the "Product") at

---

[1]  The parties have "stipulated to the dismissal of Lafarge Building Materials, Inc. as a Defendant in this matter." (Proposed Joint Pre-Trial Order at 1, Apr. 11, 2008.)  As such, this opinion addresses Plaintiffs' causes of action against the two remaining defendants, Lafarge North America Inc. and The Home Depot, Inc.

[2]  Plaintiffs' Complaint originally asserted the following five causes of action: Strict Products Liability (Count I & V), Negligence (Count II & VI), Loss of Consortium (Count VIII), Breach of Implied Warranties (Count III), and Punitive Damages (Count IV & VII).  (*See* Compl.4-11.)  However, "Plaintiffs have agreed to discontinue causes of action for breach of express and implied warranties and their allegations of punitive damages."  (Proposed Joint Pre-Trial Order at 3, Apr. 11, 2008.)  As such, this opinion addresses Plaintiffs' remaining causes of action against Defendants.

the Home Depot store in Freeport, New York. (Defs.' Local Civ. R. 56.1 Statement of Material Facts ("Defs.' 56.1") ¶ 32.) Leibstein purchased the Product for use in the installation of a radiant-heat floor in his basement. (Pls.' Revised Resp. to Defs.' Local Civ. R. 56.1 Statement of Material Facts ("Pls.' 56.1" ) at 13, ¶ 4; Defs.' 56.1 ¶ 44.) The Product, although sold by Home Depot, was manufactured and packaged by Lafarge. (Pls.' 56.1 at 12, ¶¶ 1 & 2.) Before purchasing the Product, Leibstein read the warning labels on the front and back panels of the Product's packaging. (Defs.' 56.1 ¶ 41.) The warning label on the front panel indicated: "CAUTION," "CORROSIVE," "CONTAINS PORTLAND CEMENT THAT IS INJURIOUS TO EYES, SKIN, LUNGS, AND DIGESTIVE SYSTEM," "KEEP OUT OF REACH OF CHILDREN," "SEE BACK PANEL." (Defs.' 56.1 ¶ 34; *see also* Defs.' 56.1 Ex. 9-10.) The warning label on the back panel indicated, in relevant part, as follows: "AVOID CONTACT WITH SKIN OR EYES: Contact with skin and eyes may cause irritation, corrosion, or severe burns. Wear suitable eye protection, gloves, and protective clothing. Sensitive people may develop allergic dermatitis upon contact." (Defs.' 56.1 ¶ 37; *see also* Defs.' 56.1 Ex.11-12.)

On December 5, 2004, Leibstein recruited his two teenage sons to help mix the Product with sand and water. (Pls.' 56.1 at 14, ¶ 5; Defs.' 56.1 ¶ 52.) Leibstein's sons carried the mixed cement in buckets down to the basement and deposited the mixture in a pile in one corner of the room. (Pls.' 56.1 at 14, ¶ 5; Defs.' 56.1 ¶¶ 52 & 53.) As Leibstein spread the cement over the basement floor, he knelt in the mixture for approximately thirty minutes, from about 12:30 PM until sometime after 1:00 PM. (Defs.' 56.1 ¶¶ 53 & 54; *see also* Pls.' 56.1 at 11-12, ¶ 54.) While he worked with the Product on December 5, 2004, Leibstein wore leather work boots with rubber soles, blue jeans, a flannel shirt, and cloth gloves with rubberized palms. (Defs.' 56.1 ¶

3

49; Pls.' 56.1 at 14, ¶ 6.) While Leibstein knelt in the mixture, he did not notice any wetness or dampness on his skin; nor did he experience a burning sensation or pain. (Pls.' 56.1 at 14, ¶ 8.) After he stood up, Leibstein noticed his blue jeans were "damp around the knee area." (Defs.' 56.1 ¶ 54; *see also* Pls.' 56.1 at 11-12, ¶ 54.) Leibstein brushed off "any excess lumps or anything hanging on" to his blue jeans and then continued to "work[] from [his] feet [for] most of the rest of the day." (Defs.' 56.1 ¶ 54; *see also* Pls.' 56.1 at 11-12, ¶ 54.) Leibstein removed his blue jeans later that evening when he undressed to take a shower, around 6:30 or 6:45 PM; at that point, he noticed his knees were "black." (Defs.' 56.1 ¶ 56.) Leibstein was eventually diagnosed with third-degree burns. (Pls.' 56.1 at 14-15, ¶ 11.) Leibstein underwent "debridement procedures and skin grafting surgery as part of his medical treatment followed by extensive physical therapy." (Pls.' 56.1 at 15, ¶ 12.) He has been "left with scarring and restrictions of movement and flexibility." (Pls.' 56.1 at 15, ¶ 12.)

Plaintiffs' Complaint alleges that Defendants failed to provide adequate warnings concerning the Product's hazards and that Defendants' failure to provide such warnings caused Leibstein's injuries. (*See* Compl. ¶¶ 12-13, 22-23 & 42-43.) Defendants argue that summary judgment is warranted because the Complaint does not specifically allege violations of the FHSA, but rather "allege[s] a failure to warn based upon duties arising from the common law of the State of New York." (Defs.' Mem. in Supp. of Mot. for Summ. J. ("Defs. SJ Mem.") 2.) Defendants contend that any such causes of action are preempted by the FHSA. (Defs. SJ Mem. 2.) Plaintiffs suggest, however, that "the Court should read the [C]omplaint broadly to find the necessary elements of a claim for violation[s] of the FHSA" already implicit in the Complaint, even in the absence of an amendment. (Pls.' Mem. in Opp'n to Mot. for Summ. J. and in Supp.

of Cross-Mot. for Leave to Amend ("Pls. Mem.") 7.) In the alternative, Plaintiffs cross-move for leave to amend the Complaint to specifically allege violations of the FHSA. (Pls.' Mem. 7.) Defendants counter that even if the Complaint were amended to allege violations of the FHSA, summary judgment would still be warranted because (1) FHSA violations did not cause Leibstein's injuries, (2) Leibstein was a "knowledgeable user," and (3) the hazard was "open and obvious." (Defs. SJ Mem. 2-3.) As such, Defendants contend that Plaintiffs' cross-motion for leave to amend should be denied as futile. (Defs. SJ Mem. 2-3.) However, in the event the Court concludes that there are genuine issues of material fact regarding (1) whether FHSA violations caused Leibstein's injuries, (2) whether Leibstein was a "knowledgeable user," and (3) whether the hazard was "open and obvious," Defendants urge the Court to exercise its "discretion to construe the existing [C]omplaint as alleging an FHSA cause of action" so as to avoid further delay in this litigation. (Defs.' Mem. in Opp'n to Cross-Mot. for Leave to Amend 3.)

The parties effectively agree, then, that the existence (or lack thereof) of genuine issues of material fact with regard to the three arguments listed above is ultimately determinative of both motions presently before the Court. If the Court concludes that there are no genuine issues of material fact with regard to any one of these three arguments and that Defendants are entitled to judgment as a matter of law on that argument, then Defendants' motion for summary judgment should be granted and Plaintiffs' motion for leave to amend should be denied as futile. If the Court concludes that there are genuine issues of material fact with regard to all three arguments, then Defendants' motion for summary judgment should be denied and the Compliant should be construed as alleging FHSA causes of action even in the absence of an amendment and, as such, Plaintiffs motion for leave to amend should be denied as unnecessary. The parties further agree

that FHSA issues are properly joined and ready for decision.  (*See* Defs.' 56.1 ¶ 3.)

## III.  SUMMARY JUDGMENT STANDARD

Summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") is only appropriate where admissible evidence, in the form of affidavits, deposition transcripts, or other documentation, demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law.  *See, e.g.*, *Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008); *Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994).  The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009); *Coppola v. Bear Stearns & Co.*, 499 F.3d 144, 148 (2d Cir. 2007).  No genuine issue of material fact exists when the movant demonstrates, on the basis of the pleadings and submitted evidence, that no rational jury could find in the non-movant's favor.  *See, e.g.*, *Warshawsky*, 559 F.3d at 137; *Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).  In deciding a summary judgment motion, a court must resolve all factual ambiguities and draw all reasonable inferences in favor of the non-movant.  *See, e.g.*, *Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show there *is* a genuine issue of material fact to be tried.  *See, e.g.*, *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).  The non-movant must present more than a "scintilla of evidence,"

*Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and "cannot . . . rely[] on the allegations in his pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citations omitted). Affidavits submitted in opposition to a summary judgment motion must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)).

When determining whether a genuine issue of material fact exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability." *Anderson*, 477 U.S. at 254-55. A court considering a summary judgment motion must be "mindful of the underlying standards and burdens of proof" because the evidentiary burdens that the respective parties would bear at trial guide the court in its determination of a summary judgment motion. *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252); *see also Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-movant will bear the ultimate burden of proof on an issue at trial, the movant's burden under Rule 56 will be satisfied if the movant can point to an absence of evidence to support an essential element of the non-movant's claim. *See, e.g., Brady*, 863 F.2d at 210-11. Where a movant without the underlying burden offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not

7

'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

## IV. <u>LEAVE TO AMEND STANDARD</u>

Leave to amend pursuant to Federal Rule of Civil Procedure 15 should be "freely give[n] when justice so requires," Fed. R. Civ. P. 15(a)(2), and "should not be denied unless there is evidence of undue delay, bad faith, undue prejudice to the non-movant, or futility," *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Where a cross-motion for leave to amend the complaint "is made in response to a [Rule] 56 motion for summary judgment, and the parties have fully briefed the issue [of] whether the proposed amended complaint could raise a genuine issue of fact and have presented all relevant evidence in support of their positions," there "the court may deny the amendment as futile when the evidence in support of the plaintiff's proposed new claim creates no triable issue of fact and the defendant would be entitled to judgment as a matter of law under [Rule] 56(c)." *Milanese*, 244 F.3d at 110 (citing *Azurite Corp. v. Amster & Co.*, 844 F. Supp. 929, 939 (S.D.N.Y. 1994), *aff'd*, 52 F.3d 15 (2d Cir. 1995)).

## V. <u>DISCUSSION</u>

### A. <u>Defendants' Preemption Argument</u>

Defendants argue that the Product was a "hazardous substance" as defined by the FHSA and that, as such, the FHSA expressly preempts any state causes of action that would impose labeling requirements that are not identical to the FHSA requirements. (Defs. SJ Mem. 5-8.) Plaintiffs agree that the Product was a "hazardous substance" under the FHSA and concede, insofar as their Complaint is read to assert causes of action based on New York common law duties to warn, that such causes of action are preempted by the FHSA. (*See* Pls.' Mem. 5.)

Plaintiffs contend, however, that state causes of action based on violations of the FHSA are not preempted by the FHSA and, furthermore, that such FHSA causes of action will lie under New York law.  (*See* Pls.' Mem. 5.)

The FHSA "was enacted in 1960 to 'provide nationally uniform requirements for adequate cautionary labeling of packages of hazardous substances which are sold in interstate commerce and are intended or suitable for household use.'"  *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104, 109 (2d Cir. 2001) (quoting *House Comm. on Interstate and Foreign Commerce, Federal Hazardous Substances Labeling Act*, H.R. Rep. No. 1861, at 2 (1960), *reprinted in* 1960 U.S.C.C.A.N. 2833, 2833).  Under the FHSA, a "hazardous substance" is defined as, *inter alia*, "[a]ny substance or mixture of substances which . . . is corrosive[3] . . . if such substance[] or mixture of substances may cause substantial personal injury or substantial illness during or as a proximate result of any customary or reasonably foreseeable handling or use."  15 U.S.C. § 1261(f)(1)(A) (2000).  A "misbranded hazardous substance" is a hazardous substance that is "intended, or packaged in a form suitable, for use in the household" and that fails to satisfy various labeling requirements.  15 U.S.C. § 1261(p) (2000).  The FHSA prohibits, *inter alia*, "[t]he introduction . . . into interstate commerce of any misbranded hazardous substance."  15 U.S.C. § 1263(a) (2000).

The FHSA contains an express preemption provision that "preempts any state cause of action that seeks to impose a labeling requirement different from the requirements found in the FHSA and the regulations promulgated thereunder."  *Milanese*, 244 F.3d at 109; *see also* 15

---

[3] "Corrosive" describes "any substance which in contact with living tissue will cause destruction of tissue by chemical action; but shall not refer to action on inanimate surfaces."  15 U.S.C. § 1261(i) (2000).

U.S.C. § 1261 (2000), Note "Effect upon Federal and State Law" at (b)(1)(A)-(B). However, the Second Circuit has held that "a state cause of action alleging non-compliance with the FHSA would *not* be preempted" by the FHSA, presumably because such a cause of action would not "impose a labeling requirement different from the requirements found in the FHSA and the regulations promulgated thereunder." *Milanese*, 244 F.3d at 109-10 (citing *Torres-Rios v. LPS Labs., Inc.*, 152 F.3d 11, 13 (1st Cir. 1998)). Although "there is no federal right of action under the FHSA," *Milanese*, 244 F.3d at 110 (citing *Riegel Textile Corp. v. Celanese Corp.*, 649 F.2d 894, 903 (2d Cir. 1981)), the Second Circuit has also noted that causes of action based on violations of the FHSA will lie under New York law, s*ee Milanese*, 244 F.3d at 110 (citing *Wallace v. Parks Corp.*, 629 N.Y.S.2d 570, 576 (4th Dep't 1995) (recognizing a "right to bring a suit in negligence under [New York] State law based upon a violation of FHSA")); *Richards v. Home Depot, Inc.*, 456 F.3d 76, 77 (2d Cir. 2006) ("If the product complies with the labeling requirements of the FHSA, plaintiff's failure to warn claims are preempted; otherwise the claims can go forward.").

In this case, it is undisputed that the Product was "corrosive" under the statutory definition, that the Product could "cause substantial personal injury . . . during or as a proximate result of any customary or reasonably foreseeable handling or use," that the Product was "intended, or packaged in a form suitable, for use in the household," and that the Product was sold in "interstate commerce." As such, the Court concludes that the Product was a "hazardous substance" subject to the FHSA labeling requirements. Consequently, the Court also concludes, insofar as the Complaint is read to assert causes of action based on New York common law duties to warn that would impose labeling requirements that are not identical to the FHSA

requirements, that such causes of action are preempted by the FHSA.  However, the Court further concludes that New York causes of action based on violations of the labeling requirements of the FHSA are not preempted by the FHSA.

## B.  **Defendants' Futility Arguments**

Defendants concede that New York causes of action based on violations of the FHSA are not preempted by the FHSA.  (Defs. SJ Mem. 8-9.)  However, Defendants argue that, even if the Complaint were construed or amended to allege violations of the FHSA, summary judgment would still be warranted because (1) FHSA violations did not cause Leibstein's injuries, (2) Leibstein was a "knowledgeable user," and (3) the hazard was "open and obvious."  (Defs. SJ Mem. 2-3.)

### 1.  *Defendants' FHSA Arguments*

Plaintiffs contend that the Product was "misbranded" under the FHSA in the following three respects: (a) the warning label on the Product's principal display panel failed to use the signal word "DANGER"; (b) the warning label on the Product's principal display panel failed to contain adequate "affirmative statement[s] of the principal . . . hazards"; and (c) the Product's labels failed to include adequate statements of "precautionary measures describing the action to be followed or avoided."  (Pls.' Mem. 9.)  Defendants concede, with regard to the first alleged violation, (a), that the failure to use the signal word "DANGER" was a "technical violation" of the FHSA, but argue that this violation could not have caused Leibstein's injuries.  (Defs. SJ Mem. 25-28; *see also* Defs.' Reply Mem. in Supp. of Mot. for Summ. J. ("Defs. Reply Mem.") 9-10.)  With regard to the remaining two alleged violations, (b) and (c), Defendants argue that the Product's labels satisfied the FHSA labeling requirements.  (Defs.' Reply Mem. 4-9.)

a. Failure to Use the Signal Word "DANGER"

Under the FHSA, a "corrosive" "hazardous substance" is "misbranded" if it "fails to bear a label" which contains "the signal word 'DANGER.'" 15 U.S.C. § 1261(p)(1)(C) (2000). Pursuant to regulations promulgated under the FHSA by the Consumer Product Safety Commission (the "CPSC"), the appropriate signal word must appear on the "[p]rincipal display panel," which the regulations define as "the portion(s) of the surface of the immediate container, and of any outer container or wrapping, which bear(s) the labeling designed to be most prominently displayed, shown, presented, or examined under conditions of retail sale." 16 C.F.R. § 1500.121(a)(2)(iv) (2004). Defendants concede that the use of the word "CAUTION" rather than "DANGER" on the warning label on the Product's front panel "place[d] the label outside of technical compliance with the FHSA." (Defs. SJ Mem. 26; *see also* Defs.' 56.1 ¶ 34; Defs.' 56.1 Ex. 9-10.) However, Defendants reject as "preposterous" the claim that this "technical violation" caused Leibstein's injuries. (Defs. SJ Mem. 27-28.)

Plaintiffs proffer an affidavit in support of their contention that the failure to use the signal word "DANGER" caused Leibstein's injuries. (*See* Pls.' 56.1 Ex. C at 2-4.) In that affidavit, Leibstein averred, *inter alia*, that "if the word[] 'DANGER' . . . [had appeared] on the front label of the bag of Lafarge Portland Cement, [he] would not have purchased it or used it." (Pls.' 56.1 Ex. C at 4.) Defendants contend that Leibstein's affidavit contradicts his previous deposition testimony and argue that Plaintiffs cannot create a genuine issue of material fact by proffering an affidavit that contradicts the affiant's previous deposition testimony. (Defs.' Reply Mem. 9.) Specifically, Defendants cite the following portion of Leibstein's deposition testimony:

12

> Q:  [The Complaint] says that you would not have used the [P]roduct if . . . LaFarge
> had given a different warning.  I think you've already testified here today that that's
> not true, you would have used the [P]roduct, you would have used it more cautiously.
> Can you tell me which is right, the [C]omplaint or your testimony here today?
> . . . .
> A:  No, I probably would have used the product. . . . I would not have used it in that
> way, that's correct.
> . . . .
> Q:  So forget about the [C]omplaint, I'll just ask you right here, if you had received
> the warning on the right-hand side of Exhibit 18, would you have decided not to use
> the [P]roduct at all?
> A:  No.
> Q:  What would you have decided to do?
> A:  I would have used it in a different fashion.

(Defs.' Reply Mem. Ex. 5 at 374:13-378:17.)

It is well established in the Second Circuit that "a party's affidavit which contradicts his

own prior deposition testimony should be disregarded on a motion for summary judgment."

*Mack v. United States*, 814 F.2d 120, 124 (2d Cir. 1987); *see also Raskin v. Wyatt Co.*, 125 F.3d

55, 63 (2d Cir. 1997) (quoting *Hayes v. New York Dep't of Corrections*, 84 F.3d 614, 619 (2d

Cir. 1996)) (indicating that "a party may not create an issue of fact by submitting an affidavit in

opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's

previous deposition testimony").  "If a party who has been examined at length on deposition

could raise an issue of fact simply by submitting an affidavit contradicting his own prior

testimony, this would greatly diminish the utility of summary judgment as a procedure for

screening out sham issues of fact."  *Mack*, 814 F.2d at 124 (quoting *Perma Research & Dev. Co.

v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969)).

In this case, it is difficult for the Court to discern whether there is a genuine contradiction

between Leibstein's deposition testimony and his subsequent affidavit since it is unclear to the

Court what alternative warnings Leibstein was asked to consider during his deposition.  It

appears that during his deposition Leibstein was first asked, very generally, what he would have

done if he had been given some unspecified "different warning" and then later asked, much more

specifically, what he would have done if he had been given "the warning on the right-hand side

of Exhibit 18."  (Defs.' Reply Mem. Ex. 5 at 374:13-378:17.)  However, it is unclear to the

Court, based on the record before it, what "different warning" was contemplated in the first,

general question, or what "the warning on the right-hand side of Exhibit 18" referred to in the

later, more specific question.  As such, the Court is unable to make a precise comparison

between Leibstein's deposition testimony and his subsequent affidavit, and consequently, the

Court is unable to conclude that Leibstein's affidavit contradicts his previous deposition

testimony.[4]  Accordingly, the Court cannot disregard Leibstein's affidavit.  The Court also

concludes that Leibstein's affidavit is amply sufficient to create a genuine issue of material fact

regarding whether the failure to use the signal word "DANGER" caused Leibstein's injuries.[5]

---

[4]  In a footnote, Plaintiffs imply that "the warning on the right-hand side of Exhibit 18" referred to a later version of the warning label that Lafarge allegedly began placing on the Product in 2003.  (*See* Pls.' Mem. in Opp'n to Objections to Admissibility of Evidence 3 n.2.) Even if this is correct, it is nonetheless unclear to the Court how (if at all) this alleged later version of the warning label differed with regard to its use of the signal word "DANGER" on the principal display panel.  Although Plaintiffs provide an image of what appears to be a modified verison of the warning label from the back panel of the Product, Plaintiffs provide no corresponding image of the warning label from the front panel.  (*See* Pls.' 56.1 at 20, ¶ 43.)  As such, even assuming Leibstein was asked to consider this alleged later version of the warning label during his deposition, the Court would still be unable to make a precise comparison between Leibstein's deposition testimony and his subsequent affidavit.

[5]  On a motion for summary judgment, the Court cannot "weigh evidence or assess the credibility of witnesses," *Hayes*, 84 F.3d at 619 (citing *United States v. Rem*, 38 F.3d 634, 644 (2d Cir.1994)), as "[t]hese determinations are within the sole province of the jury," *Hayes*, 84 F.3d at 619 (citing *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir.1994)).  Although Defendants characterize as "preposterous" the claim that the use of the signal word "CAUTION" rather than "DANGER" caused Leibstein's injuries (Defs. SJ Mem. 27-28), it is not the Court's place on a motion for summary judgment to disregard Leibstein's affidavit based merely on Defendants' insistence that the sworn statements contained therein are not credible.

Furthermore, even assuming *arguendo* that Leibstein's deposition testimony and his subsequent affidavit are contradictory as to whether he would have used the product, nonetheless both his deposition and his affidavit (when viewed in the light most favorable to Plaintiffs, the non-movants) appear to support the same crucial conclusion—namely, that given a different warning, Leibstein would not have been injured by the Product—even if each reaches this conclusion by a different route. *See generally* Complaint ¶ 13 ("except for defendants' lack of warning of the danger of their product, Plaintiff would not have used [the product] or sustained said injuries.")  Thus, even excluding the affidavit from its consideration,  it appears to the Court that Leibstein's deposition testimony provides an independent route (i.e., via more cautious use rather than via a failure to purchase the Product at all) to the conclusion that the failure to include the signal word "DANGER" may have caused Leibstein's injuries.  As such, any contradictions between Leibstein's deposition testimony and his subsequent affidavit are ultimately irrelevant here since Leibstein's deposition testimony, taken by itself, is sufficient to defeat Defendants' motion for summary judgment on this issue.[6]

Accordingly, the Court concludes that there are genuine issues of material fact regarding whether the failure to use the signal word "DANGER" on the Product's principal display panel caused Leibstein's injuries.

---

[6]  Defendants also cite *Penwell v. Rust-Oleum Corp.*, No. 06-C-337-S, 2006 WL 3792660 (W.D.Wis. Dec. 22, 2006), in support of their claim that use of an incorrect signal word cannot, as a matter of law, cause injury where the plaintiff actually read the full text of the warning. Defendants' reliance on *Penwell* is misplaced.  *Penwell* nowhere opines that the use of an incorrect signal word cannot, as a matter of law, cause injury where the plaintiff actually read the full text of the warning.  Rather, *Penwell* appears to hold, at most, that "using a signal word which is stronger than that prescribed by the regulation could not conceivably [have] been the cause of plaintiff not observing the warning."  *Penwell*, 2006 WL 3792660, at *2.

b. <u>Failure to Include an Adequate "Affirmative Statement" of the "Principal Hazards"</u>

Under the FHSA, a "hazardous substance" is "misbranded" if it "fails to bear a label" which contains "an affirmative statement of the principal hazard or hazards, such as 'Flammable', 'Combustible', 'Vapor Harmful', 'Causes Burns', 'Absorbed Through Skin', or similar wording descriptive of the hazard." 15 U.S.C. § 1261(p)(1)(E) (2000). Pursuant to regulations promulgated by the CPSC, "the statement of principal hazard(s)" must appear on the "[p]rincipal display panel." 16 C.F.R. § 1500.121(b)(2)(ii) (2004). Plaintiffs contend that the Product was misbranded because the warning label on the Product's front panel failed to include "CAUSES BURNS" as a principal hazard.[7] (Pls.' Mem. 24-26.) Defendants argue that "CORROSIVE" and "INJURIOUS TO . . . SKIN" adequately state the danger of severe chemical burns. (Defs.' Reply Mem. 4-7.)[8]

In *Milanese v. Rust-Oleum Corp.*, 244 F.3d 104 (2d Cir. 2001), the Second Circuit held that, because the plaintiff in that case had proffered "substantial evidence of the specific risk of

----

[7] Plaintiffs' expert, Dr. Burton Z. Davidson, contends that the Product was misbranded in that the warning label on the Product's principal display panel failed to state "[s]evere . . . skin burns by the bleeding of highly caustic water juices . . . from wet-cement through protective work clothing" as a principal hazard. (Defs.' 56.1 Ex. 5 at 7.) However, Plaintiffs do not rely upon this contention in their motion papers and instead argue that "CAUSES BURNS" should have been listed as a principal hazard.

[8] The fact that the warning label on the Product's back panel warned that "[c]ontact with skin . . . may cause . . . severe burns" is not dispositive here. (Defs.' 56.1 ¶ 37; *see also* Defs.' 56.1 Ex.11-12.) Under the CPSC regulations, the principal display panel is required to affirmatively state the product's principal hazards, *see* 16 C.F.R. § 1500.121(b)(2)(ii) (2004), and this requirement cannot be satisfied by "a warning-by-reference" on the principal display panel that directs the user to read additional warnings written elsewhere, *Richards v. Home Depot, Inc.*, 456 F.3d 76, 78 (2d Cir. 2006). As such, although the warning label on the Product's front panel indicated "SEE BACK PANEL" (Defs.' 56.1 ¶ 34; *see also* Defs.' 56.1 Ex. 9-10) and the Product's back panel warned "[c]ontact with skin . . . may cause . . . severe burns" (Defs.' 56.1 ¶ 37; *see also* Defs.' 56.1 Ex.11-12), this is not fatal to Plaintiffs' argument that the Product was misbranded due to its failure to include "CAUSES BURNS" as a principal hazard on the Product's principal display panel.

vapor flash fire . . . as an *additional* hazard distinct from the flammability of the liquid product," there was "a material issue of fact as to whether the danger of flash fire caused by the vapors [wa]s a primary hazard that [wa]s separate and distinct from the flammability of the liquid product." *Milanese*, 244 F.3d at 111-12. Moreover, "[a]ssuming that flash fire from the . . . *vapor* [wa]s a hazard distinct from the flammability of the *liquid* product," the Second Circuit indicated that, under the facts of that case, it could not "hold that, as a matter of law, the [label] fully complie[d] with the FHSA." *Milanese*, 244 F.3d at 112. After comparing the warning label at issue in *Milanese* to a label "previously required by the [CPSC] to be placed on extremely flammable contact adhesives" and noting that the *Milanese* label failed to include some of the language the label previously required by the CPSC, the Second Circuit concluded there were "genuine issues of material fact as to . . . whether the [*Milanese* label] identified th[e] principal hazard [of vapor flash fire] and the necessary precautionary measures as required by the FHSA." *Milanese*, 244 F.3d at 113.

In holding that there were genuine issues of material fact concerning whether the *Milanese* label complied with the FHSA labeling requirements, the Second Circuit was presumably suggesting that a rational jury could find, pursuant to proper instructions and based on the evidence in the record, that the *Milanese* label was noncompliant with the FHSA. *See, e.g.*, *Uzdavines v. Weeks Marine, Inc.*, 418 F.3d 138, (2d Cir. 2005) (quoting *Chandris, Inc. v. Latsis*, 515 U.S. 347, 369 (1995)) (indicating that "where 'statutory terms are at issue, their interpretation is a question of law and it is the court's duty to define the appropriate standard" but that "[i]f reasonable persons, applying the proper legal standard, could differ . . . it is a question [of fact]" for the jury). The Eighth Circuit appears to have adopted an approach similar to that

suggested by *Milanese*. In *Mattis v. Carlon Electrical Products*, 295 F.3d 856 (8th Cir. 2002), the Eighth Circuit held "there was a question of fact for the jury about whether the[] [FHSA] requirements were met . . . because the evidence about the harmful effects of Carlon cement called into question whether the label's statements about principal hazards, precautionary measures, or instructions for handling were inadequate." *Mattis*, 295 F.3d at 862. The Eighth Circuit further indicated that "the jury was properly instructed that if the label contained all the information required by the FHSA, the [defendents] were not negligent," *Mattis*, 295 F.3d at 862, and moreover that because "the alleged inadequacy of the warning [wa]s within the comprehension of the average layperson. . . . the jury was capable of finding noncompliance with the FHSA without expert testimony," *Mattis*, 295 F.3d at 862 n.4. In light of *Milanese* and *Mattis*, then, the Court concludes that the appropriate question to address here is whether a rational jury could find that the warning label on the Product's front panel was noncompliant with the FHSA in that it failed to include adequate affirmative statements of the Product's principal hazards.[9]

Plaintiffs cite the Merriam-Webster Online Dictionary in support of their view that the danger of severe chemical burns is not encompassed by the term "CORROSIVE." Specifically, Plaintiffs contend that "[c]orrosion is by definition a slow process" and insist that "contextually it usually refers to the breakdown of metals or other inanimate surfaces[;] [i]t does not suggest

_____

[9] Defendants argue that *Moss v. Parks Corp.*, 985 F.2d 736 (4th Cir. 1993) and a number of other cases arising outside the Second Circuit, *see, e.g.*, *Pennsylvania General Insurance Co. v. Landis*, 96 F. Supp. 2d 408, 412 (D.N.J. 2000) (citing *Moss*, 985 F.2d at 741-42), reflect an "appropriate reluctance" to leave the question of FHSA compliance to "jury determinations about the sufficiency of warnings for products that are sold nationwide" (Defs. SJ Mem. 15). However, this Court is mindful of the Second Circuit's admonishment that the *Moss* "decision . . . obviously is not binding on this Circuit." *Milanese*, 244 F.3d at 112 n.1.

immediate burning of human flesh." (Pls.' Mem. 21, 25.) Defendants counter that Plaintiffs' preferred definition of "CORROSIVE" is sharply at odds with the statutory and regulatory definitions of that term.[10] (Defs.' Reply Mem. 5.) Plaintiffs argue that the statutory and regulatory definitions should not control here, as these definitions were intended only to "define the limits of the [FHSA] and to guide the [CPSC] in making their determinations as to which products are 'hazardous substances'" subject to the FHSA labeling requirements, whereas the "common English definition" is much more relevant "when assigning a meaning to [a] word on a label . . . because that is the definition the consumer will use when reading the label." (Pls.' Mem. 22.)[11] Recasting Plaintiffs' argument here somewhat, it appears to the Court that Plaintiffs argue, in effect, that a rational jury could find that the term "CORROSIVE" fails to communicate to an ordinary consumer that the Product can cause severe chemical burns and that, as such, "CORROSIVE" is not an adequate "affirmative statement of the principal hazard" under 15 U.S.C. § 1261(p)(1)(E).

The Court is not prepared to hold, as a matter of law, that "CORROSIVE" constitutes an adequate affirmative statement of the Product's principal hazards. In particular, the Court

---

[10] Under the FHSA, the term "corrosive" describes "any substance which in contact with living tissue will cause destruction of tissue by chemical action; but shall not refer to action on inanimate surfaces." 15 U.S.C. § 1261(i) (2000). The regulations promulgated by the CPSC further indicate as follows:

> The definition of corrosive . . . is interpreted to also mean the following: Corrosive means a substance that causes visible destruction or irreversible alterations in the tissue at the site of contact. A test for a corrosive substance is whether, by human experience, such tissue destruction occurs at the site of application. A substance would be considered corrosive to the skin if, when tested on the intact skin of the albino rabbit by the technique described in § 1500.41, the structure of the tissue at the site of contact is destroyed or changed irreversibly in 24 hours or less.

16 C.F.R. § 1500.3(c)(3) (2004).

[11] *See generally* 15 U.S.C. §1261(p)(1) (requiring label of any hazardous substance which is defined as "highly toxic" by subsection (h) to contain the word "poison").

concludes that a rational jury could find that "CORROSIVE" fails to communicate that the Product can cause severe chemical burns as opposed to the gradual breakdown of inanimate surfaces. Similarly, the locution "INJURIOUS TO . . . SKIN," fails to communicate that the Product can cause severe chemical burns as opposed to other, less serious or superficial damage (e.g., skin irritation).[12]

Accordingly, the Court concludes that there are genuine issues of material fact regarding whether the Product's labels contained adequate affirmative statements of the Product's principal hazards. Moreover, in light of Leibstein's affidavit, in which Leibstein averred that if "'CAUSES BURNS' [had been] on the front label of the bag of Lafarge Portland Cement, [he] would not have purchased it or used it" (Pls.' 56.1 Ex. C at 4), the Court concludes that there are genuine issues of material fact regarding whether Defendants' failure, if any, to include adequate affirmative statements of the Product's principal hazards caused Leibstein's injuries.

c. Failure to Include Adequate "Precautionary Measures" Describing the "Action to be Followed or Avoided"

Under the FHSA, a "hazardous substance" is "misbranded" if it "fails to bear a label" which "states conspicuously" "precautionary measures describing the action to be followed or avoided." 15 U.S.C. § 1261(p)(1)(F) (2000). Plaintiffs argue that the Product's labels violated this precautionary measures requirement in that the labels failed to warn users against "indirect

_____

[12] Plaintiffs also cite a letter from Mary F. Toro (the "Toro Letter"), a compliance officer with the CPSC. (*See* Pls.' Mem. 25; *see also* Pls.' Mem. in Opp'n to Objections to Admissibility of Evidence Ex. B.) Defendants object to the consideration of the Toro Letter on the ground that, *inter alia*, the letter is inadmissible hearsay. (*See* Defs.' Mem. in Supp. of Objections to Admissibility of Evidence 3-5.) The Court need not address Defendants' admissibility argument here, however, since the Court concludes, even without considering the Toro Letter, that there are genuine issues of material fact regarding whether the Product's labels contained adequate affirmative statements of the Product's principal hazards.

contact [through ordinary clothing] as a potential means of injury" and in that the labels failed to advise users regarding "what type of protective clothing was required." (Pls.' Mem. 18-19.) Defendants argue that the Product's labels satisfied the precautionary measures requirement. (Defs. SJ Mem. 17-22; Defs.' Reply Mem. 7-9.)

Plaintiffs proffer two pieces of evidence in support of their claim that the Product's labels failed to satisfy the precautionary measures requirement: an expert's report from Dr. Burton Z. Davidson (the "Davidson Report") and a letter from Mary F. Toro (the "Toro Letter"), a compliance officer with the CPSC.. (*See* Defs.' 56.1 Ex. 5; Pls.' Mem. in Opp'n to Objections to Admissibility of Evidence Ex. B.) Defendants apparently do not oppose consideration of the Davidson Report here;[13] however, Defendants do object to the consideration of the Toro Letter on the ground that, *inter alia*, the letter is inadmissible hearsay. (*See* Defs.' Mem. in Supp. of Objections to Admissibility of Evidence 3-5.) The Court need not address the admissibility of the Toro Letter here, however, because the Court concludes, even without considering the Toro Letter, that there are genuine issues of material fact regarding whether the Product's labels satisfied the precautionary measures requirement.

Defendants argue, *inter alia*, that the Product's labels satisfied the precautionary

---

[13] Defendants indicate in a footnote that they "expressly reserve and do not waive Defendants' position that Dr. Davidson's testimony in this case is inadmissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-96 (1993)." (Defs. SJ Mem. 7-8 n.25.) However, Defendants never argue in their motion papers that the Davidson Report should not be considered for the purposes of deciding the two motions presently before the Court. Indeed, although Defendants object to the consideration of any "new opinions" expressed by Dr. Davidson in an affidavit that was sworn by Dr. Davidson after discovery had been certified as complete (*see* Ct.'s Order (Boyle, Mag. J.), Apr. 14, 2008; Pls.' 56.1 Ex. G), Defendants affirmatively recommend that the Court should "consider[] [] Dr. Davidson's views . . . [as] set forth in his timely disclosed expert report [i.e., the Davidson Report]" (Defs.' Mem. in Supp. of Objections to Admissibility of Evidence 2).

measures requirement because the labels instructed the user to "AVOID CONTACT WITH SKIN" and to "[w]ear suitable . . . protective clothing." (Defs.' 56.1 ¶ 37; *see also* Defs.' 56.1 Ex.11-12.) Plaintiffs counter that these instructions are insufficiently explicit to effectively advise the user regarding the actions to be followed or avoided. In particular, Plaintiffs contend that while "AVOID CONTACT WITH SKIN" warns the user to avoid "direct" contact between bare skin and the Product itself (either in dry or mixed forms), it nonetheless fails to warn against "indirect" contact with "alkali rich 'juices'" that can "bleed[] . . . through the Levi-type jeans by capillary action and diffusive processes." (Defs.' 56.1 Ex. 5 at 2.) The Davidson Report argues that such "indirect" exposure represents a distinct "hazard mode[]" where "[f]or the most part, the wet 'paste,' or 'wet mud' of the cement mixture, remains physically separated from direct skin contact [by] the outside surfaces of the protective jeans, but . . . the watery alkali 'juices' [are not so separated]." (Defs.' 56.1 Ex. 5 at 2, 4.) Moreover, Plaintiffs contend that "[w]ear suitable . . . protective clothing" fails to advise the user that it is necessary to wear "rubberized waterproof knee pads, rubberized waterproof gloves, etc., to prevent the hazard of indirect exposure to strong alkali 'juices.'" (Defs.' 56.1 Ex. 5 at 8.) In sum, then, Plaintiffs cite the Davidson Report in support of their view that the Product was misbranded in that the Product's labels failed to describe precautionary measures necessary to avoid the danger of "indirect" exposure to "watery alkali 'juices'" through ordinary clothing.

The Court is not prepared to hold, as a matter of law, that "AVOID CONTACT WITH SKIN" and "[w]ear suitable eye protection, gloves, and protective clothing" satisfy the precautionary measures requirement. A rational jury could find that the Product was misbranded in that it did not describe precautionary measures necessary to avoid the danger of "indirect" exposure to "watery

alkali 'juices'" through ordinary clothing.  In other words, a jury could conclude that the warning

was inadequate because either (a) it failed to direct consumers to avoid contact with skin . . . *and*

*clothing* or (b) it failed to advise that *impervious* protective clothing should be worn.  Moreover, in

light of Leibstein's affidavit, in which Leibstein averred that if "proper precautionary measures [had]

been given to [him] on the label such as the necessity to wear waterproof knee pads or a protective

board if kneeling in the cement, [he] would have done so" and that "if the label [had] advised [him]

that indirect contact through clothing could cause severe burns . . . [he] would not have kneeled in it

while troweling it over the floor" (Pls.' 56.1 Ex. C at 3-4), there are genuine issues of material fact

regarding whether failures to satisfy the precautionary measures requirement, if so found by the

jury, caused Leibstein's injuries.

## 2. *Defendants' "Knowledgeable User" Argument*

Under New York law, the knowledgeable user exception exempts manufacturers and

distributors from liability for a failure to warn where the user was "fully aware of the nature of

the product and its dangers."  *Billiar v. Minn. Mining & Mfg. Co.*, 623 F.2d 240, 243 (2d Cir.

1980) (citing *Rosebrock v. Gen. Elec. Co.*, 236 N.Y. 227 (1923)).  In such a case, the user's

knowledge of a particular danger "may well obviate the failure to warn as a legal cause of an

injury resulting from that danger."  *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 241 (1998) (citing

*Smith v. Stark*, 67 N.Y.2d 693, 694 (1986)).  The knowledgeable user exception is "usually

reserved for professionals or other experts who are experienced with the product in question."

*Donald v. Shinn Fu Co. of America*, No. 99-CV-6397 (ARR), 2002 WL 32068351, at *8

(E.D.N.Y. Sept. 4, 2002) (citing *Billiar*, 623 F.2d at 243).  The exception "involves a subjective

test," *Kerr v. Koemm*, 557 F. Supp. 283, 287 (S.D.N.Y. 1983) (citing *McDaniel v. Williams*, 257

N.Y.S.2d 702 (1st Dep't 1965)), that focuses on the user's "actual knowledge," *Donald*, 2002 WL 32068351, at *8 (quoting *Liriano*, 92 N.Y.2d at 241). General knowledge that the product is dangerous does not suffice; to fall under the exception, the user must have known about the "specific hazard" that caused the injury, *Donald*, 2002 WL 32068351, at *8 (quoting *Liriano*, 92 N.Y.2d at 241), and must have appreciated the "severity of the danger," *Billiar*, 623 F.2d at 244. Although in "appropriate cases" a court may "as a matter of law decide that a manufacturer's warning would have been superfluous given an injured party's actual knowledge of the specific hazard that caused the injury," *Liriano*, 92 N.Y.2d at 241 (citing *Smith v. Stark*, 67 N.Y.2d 693 (1986)), "where reasonable minds might disagree as to the extent of [the] plaintiff's knowledge of the hazard, the question is one for the jury," *Liriano*, 92 N.Y.2d at 241 (citing *Jiminez v. Dreis & Krump Mfg. Co.*, 736 F.2d 51, 55-56 (2d Cir. 1984)); *see also Billiar*, 623 F.2d at 244 (citing *Rosebrock*, 236 N.Y. at 237) (indicating that where "[t]he extent of plaintiff's knowledge of the danger [i]s . . . in dispute. . . . New York courts have left the question whether there was a duty to warn to the trier of fact").

Citing Leibstein's education, profession, previous experience with cement, and deposition testimony, Defendants argue that any reasonable trier of fact would conclude that Leibstein was "actually aware of the hazard of severe burns posed by contact with Portland cement." (Defs. SJ Mem. 31.) Plaintiffs counter that Leibstein lacked specific knowledge about the Product's hazards and argue that his relative lack of experience with cement demonstrates that, as a matter of law, Leibstein could not have qualified as a "knowledgeable user" of the Product. (Pls.' Mem. 28-31.)

The Court concludes that reasonable minds could disagree regarding the extent of

Leibstein's knowledge and, as such, that under New York law "the question is one for the jury." *Liriano*, 92 N.Y.2d at 241 (citing *Jiminez*, 736 F.2d at 55-56). In particular, although Leibstein testified that he was aware that "cement" could cause "severe burns" (Pls.' 56.1 Ex. B at 271:20-273:21), Leibstein also indicated that he "believed that the moisture in the cement mixture was 'just water' and did not present the same hazard as the cement itself" (Pls.' 56.1 at 14, ¶ 7; *see also* Pls.' 56.1 Ex. B at 275:25-276:9). Accordingly, the Court concludes that there are genuine issues of material fact concerning the extent of Leibstein's knowledge of the Product's hazards.

### 3. *Defendants' "Open and Obvious" Argument*

Under New York law, the open and obvious doctrine relieves manufacturers and distributors from a duty to warn "[w]here a danger is readily apparent as a matter of common sense." *Liriano v. Hobart Corp.*, 92 N.Y.2d 232, 242 (1998). The doctrine involves an "objective" test that "does not turn on the actual knowledge of the user" but rather "on whether the danger was sufficiently obvious that it would be unreasonable to impose . . . a duty to warn." *Kerr v. Koemm*, 557 F. Supp. 283, 287 (S.D.N.Y. 1983). Under the doctrine, manufacturers and distributors need not warn "users . . . [about] those dangers which they would have or should have 'appreciated to the same extent as a warning would have provided.'" *Oza v. Sinatra*, 575 N.Y.S.2d 540, 542 (2d Dep't 1991) (quoting *Caris v. Mele*, 521 N.Y.S.2d 260, 261 (2d Dep't 1987)). In contrast, "the open and obvious defense generally should not apply when there are aspects of the hazard which are concealed or not reasonably apparent to the user." *Liriano*, 92 N.Y.2d at 242. "Because of the factual nature of the inquiry, whether a danger is open and obvious is most often a jury question." *Liriano*, 92 N.Y.2d at 242 (citing *Bolm v. Triumph Corp.*, 33 N.Y.2d 151, 159-60 (1973)). Indeed, a court should decide that a risk was open and

obvious as a matter of law only in cases where "only one conclusion can be drawn from the established facts." *Liriano*, 92 N.Y.2d at 242.

Defendants argue that "[t]he danger of kneeling into a known corrosive chemical while wearing only cotton blue jeans, and allowing that corrosive chemical to soak into the jeans, is open, obvious, and a simple matter of common sense." (Defs. SJ Mem. 33.) However, Defendants' preferred characterization of the question here relies heavily on Leibstein's own particular knowledge that the mixed cement was "corrosive." As such, it appears to the Court that Defendants implicitly attempt to convert the open and obvious doctrine into a subjective rather than an objective test. In the Court's view, the appropriate question to address here is whether it was readily apparent as a matter of common sense that kneeling on the mixed cement while wearing blue jeans could result in severe chemical burns.

Plaintiffs argue that there "was nothing objective about the [P]roduct which would demonstrate to the user that indirect contact would cause severe chemical burns." (Pls.' Mem. 33.) In his affidavit, Leibstein averred that "the cement mixture . . . did not eat through [his] jeans; it did not have a pungent odor; it did not smoke like an acid; [he] did not feel any heat or burning or any 'acidic' reaction on [his] skin[;] [i]n fact, [he] did not even feel any dampness or wetness on [his] knees." (Pls.' 56.1 Ex. C at 3.) In light of Leibstein's affidavit and related deposition testimony, the Court is not prepared to hold, as a matter of law, that it was readily apparent as a matter of common sense that kneeling in the mixed cement while wearing blue jeans could result in severe chemical burns. Accordingly, the Court concludes that there are genuine issues of material fact regarding whether the Product's hazards were open and obvious.

## VI.  CONCLUSION

For all the foregoing reasons, Defendants' motion for summary judgment is DENIED and

Plaintiffs' cross-motion for leave to amend their Complaint is also DENIED.

**SO ORDERED**

Dated: February 12, 2010
        Central Islip, New York

                                        /s/_____
                                        Denis R.  Hurley
                                        Senior District Judge