```
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------X
JEFFREY LEIBSTEIN and ELENA
LEIBSTEIN,                                    MEMORANDUM AND ORDER
              Plaintiffs,                     CV-06-6460(DRH)

         -against-

LAFARGE NORTH AMERICA, INC.,
LAFARGE BUILDING MATERIALS,
INC., one or more of which are
d/b/a/ LAFARGE CORP., and THE
HOME DEPOT, INC.,

              Defendants.
------------------------------X
A P P E A R A N C E S:

Attorneys for Plaintiffs:
     Dankner & Milstein, P.C.
     41 East 57th Street
     New York, New York  10022

Attorneys for Defendants:
     Harry F. Mooney
     Hurwitz & Fine, PC
     1300 Liberty Building
     Buffalo, New York  14202

HURLEY, Senior District Judge
```

Presently before the Court is a motion by plaintiffs Jeffrey Leibstein and Elena Leibstein, brought pursuant to Fed. R. Civ. P. 59, seeking a new trial.

BACKGROUND

Jeffrey Leibstein purchased twelve ninety-four pound bags of portland cement (the "Product") from Home Depot on November 28, 2004. After mixing the portland cement with other elements, and while using the resulting concrete to lay a radiant-heat floor in his basement on December 5, 2004, he

sustained third-degree burns to his knees. Suit was commenced based on those injuries against Home Depot and the other defendants listed in the caption under a series of theories, including the purported misbranding of the Product by the manufacturer LaFarge North America, Inc. In addition, Elena Leibstein asserted a loss of consortium claim.

The case was tried for several weeks in November 2010, with the jury reaching a verdict in favor of Jeffrey Leibstein on November 29, 2010 in the amount of $125,400.00.[1] Judgment was entered on November 30, 2010. The current motion for a new trial - presumably triggered by plaintiffs' disappointment as to the size of the award - was timely filed six days thereafter. See Fed. R. Civ. P. 59(b).

## MOTION FOR NEW TRIAL

1. Basis for Plaintiffs' Motion

In support of plaintiffs' motion for a new trial, Elena Leibstein explains:

> Following the discharge of the jury, my husband and I spoke with four of the eight jurors. During those conversations, I was informed that, during the deliberations, two jurors disclosed facts that were unknown to me and my attorneys. Nor were these facts disclosed by the jurors during the selection process held on November 15, 2010.
>
> Specifically, juror number four, David

---

[1] The jury rejected Elena Leibstein's loss of consortium claim.

>     Donlon ["Donlon"], disclosed that a member of
>     his family had been burned while using a
>     Portland Cement product.  Additionally, juror
>     number five, John Bunchuck ["Bunchuck"],
>     disclosed that he had been or was a defendant
>     in a civil lawsuit.  Neither of these facts
>     were mentioned or disclosed in jury
>     selection, although I recall that such
>     questions were asked of the people who
>     comprised the prospective panel of jurors.
>
>     I am advised my attorney that had he been
>     aware or advised of these facts, that he
>     would have sought what is called a 'challenge
>     for cause' or exercised what is called a
>     'peremptory challenge' as to one or both of
>     these gentlemen.  He also advised me that
>     these non-disclosed facts may very well have
>     entered into the deliberation or the thought
>     processes of these two or other jurors in
>     rendering the verdict.
>
>     I strongly feel, given these non-
>     disclosures, that we did not receive a fair
>     deliberation of the issues in the case by an
>     impartial jury.

Dec. 2, 2010 Aff. of Elena Leibstein, ¶¶ 4, 5, and 6.

Plaintiffs' basis for seeking a new trial as outlined above is supplemented by the comment that an "analysis of the verdict sheet . . . leads to the inescapable conclusion that it was a result of a compromise verdict."  (Pl.'s Mem. Law at 2.) Plaintiffs venture the view that Jurors Donlon and Bunchuck "very well might have been the catalyst[s]" for the perceived compromise verdict. (Id. at 3.)[2]

---

[2] Plaintiffs' reference to a "compromise verdict" is advanced not as a ground for the relief sought, but rather as a possible result of Donlon and Bunchuck being seated as jurors. See Pls.' Mem. at 3 (Plaintiffs, after providing the reasons they

2.  <u>Defendants' Position</u>

In opposing the requested relief, defendants argue (1) plaintiffs do not have standing to seek the requested relief given the "high-low" agreement entered into between the parties during jury deliberations, and (2) even if plaintiffs' argument is addressed on the merits, the proffered information is insufficient as a matter of law to grant a new trial.

DISCUSSION

1.  <u>High-Low Agreement</u>

By way of format, I will first discuss defendants' position that plaintiffs lack "standing" to seek a new trial as a result of the high-low agreement. (Defs.' Mem. in Opp'n at 1.) If that threshold argument is correct, the other issues raised by the parties are academic and need not be addressed.

On November 25, 2010, while the jury was deliberating, a high-low agreement was placed on the record whereby "under no circumstances would the defendants have to pay anything above the sum of $400,000 and in no event would plaintiffs receive any less than the sum of $100,000" regardless of the jury's verdict. (<u>See</u> Nov. 29, 2010 Trial Transcript ("Tr.") at 988.) It was understood that "should the high-low apply in essence there

---

believe the verdict reached was a product of compromise, explain: "Be that as it may, this motion seeks a new trial based on the fact that two of the jurors . . . failed to disclose certain information during the <u>voir</u> <u>dire</u> process").

[would] be a settlement, so there would be no appeal by either party." However, if the jury failed to reach a verdict, characterized by plaintiffs' counsel as "the deadlock issue," the agreement would not be activated. (Id. at 991.)

Defendants, in claiming that the high-low agreement constituted a settlement explicitly not subject to appeal nor, the argument continues, impliedly subject to post-verdict motions, rely not only on the above transcript references but on others as well, to wit:

a) the statement by plaintiffs' counsel that "[i]f after such calculation [for comparative negligence], it [i.e. the verdict] is between $100,000 and $400,000, that would be the number that the plaintiffs would receive, and this would be viewed as a settlement that would be paid within 21 days after service of the closing papers," (Tr. at 989) (emphasis added), referenced in Defs.' Mem. in Opp'n at 3, (hereinafter referred to as "Statement (a)"); and

b) the statement by plaintiffs' counsel upon the return of the verdict: "I understand just on the math that according to our agreement, the defendants are obligated to [pay] the sum of $125,400 . . . as per the high-low agreement we placed on the record this morning" (emphasis added). (Tr. at 1015); Def.'s Mem. in Opp'n at 3-4, (hereinafter referenced as "Statement (b)").

Plaintiffs' counter argument to defendants' reliance on the high-low agreement is twofold: "the agreement wasn't . . . triggered" since the verdict was more than $100,000 and less than $400,000, (Pls.' Mem. of Law at 8), and, even arguendo, it was, the agreement presupposed a "fair and impartial jury would . . . render a non-coerced verdict." (Id.)

The following excerpt from the New York State Appellate Division, Second Department decision in Cunha v. Shapiro, well synopizes the gravamen of high-low agreements:

> A high-low agreement, when initially reached
> by the parties in a litigation, is, in fact,
> a conditional settlement. The condition of
> the agreement is that the jury render a
> verdict that falls outside the range of the
> high-low agreement. When a verdict is
> rendered outside of the agreed-upon range,
> the condition is triggered and the "high" or
> the "low" becomes binding upon the parties as
> a settlement. By contrast, when a jury
> renders a verdict within the range of the
> high-low agreement, the condition is not met
> and the high-low agreement is rendered
> academic.

42 App. Div. 3d 95, at 98-99, 837 N.Y.S.2d 160, at 163 (2d Dep't 2007).

At first blush it may seem that defendants' reliance on the high-low agreement is misplaced because the jury's verdict neither fell below $100,000 nor exceeded $400,000 and thus the condition precedent necessary to trigger obligations under the contract never materialized nor could materialize. But, as noted in Cunha the "[p]arties entering into high-low agreements are

free to craft the terms of their agreement on the record in any manner that is mutually acceptable to them."  837 N.Y.S.2d at 166; see also Vargas v. Marquis, 65 App. Div. 3d 1332, 885 N.Y.S. 2d 747, 748 (2d Dep't 2009).  Which is to say, the parties may fashion a contract, entitled a "High-low Agreement," some of the provisions of which may be out-of-sync with what is typically found in an agreement bearing that caption and, to the extent they do so, the provisions of their agreement will obviously control.  Defendants correctly claim plaintiffs did just that.

Vargas is instructive for present purposes.  There, "the stipulation read into the record by defense counsel, to which the plaintiff's counsel 'agreed,' was as follows:

> At the conclusion of the case, regardless of what the verdict is, plaintiff's counsel will give a stipulation of discontinuance and general release.  If the number were zero, we'll still pay you 25 thousand dollars pursuant to that agreement.  If the number is over 275 thousand, well, the release would be for 275 thousand dollars.  And obviously, if the number is somewhere in between, it will be for whatever that number was.

Vargas, 885 N.Y.S.2d at 748.

The verdict was $135,000, i.e., like the verdict in favor of Jeffrey Leibstein, above the low and below the high of the amounts in the high-low agreement.  Pursuant to the stipulation, the defendants in Vargas were prepared to pay the face amount of verdict upon the tendering of the required documents by plaintiff, not that sum plus interest and costs as

demanded by plaintiff.

In reversing the lower court and adopting defendants' position, the Second Department held:

> Under the particular circumstances of this case, we agree with the defendants that pursuant to the terms of the high-low stipulation at issue, the plaintiff's counsel was obligated to furnish a stipulation of discontinuance and general release-<u>not</u> to submit a judgment containing a substantial amount of interest and costs – 'regardless of what the verdict is' and for 'whatever [the] number was.' Since there was no showing that the high-low stipulation was the product of fraud, duress, overreaching, or unconscionability, its terms must stand.

(<u>Id.</u>)

Here, as in <u>Vargas</u>, a verdict within the high-low bracket was returned. And here, like in <u>Vargas</u>, plaintiffs agreed that the amount of the intra-bracket verdict "would be the number that the plaintiffs would receive," statement (a) <u>supra</u>, i.e. not that sum plus interest and costs. That was so, as explained on the record by movants' counsel, because the amount of the intra-bracket verdict "would be viewed as a settlement that would be paid within 21 days after service of the closing papers." Statement (a) <u>supra</u>.

In sum, and prescinding for the moment from plaintiffs' claim that the verdict is, in effect, a non-verdict, I conclude "[u]nder the particular circumstances of this case," <u>Vargas</u>, 885 N.Y.S.2d at 778, that the high-low agreement represented a

settlement of the case covering several contingencies including an intra-bracket verdict. As such, again prescinding from plaintiffs' fair-trial claim, the settlement would have precluded their current Rule 59 motion for a new trial.

The next question to be addressed is whether the settlement agreement is impervious to attack even if plaintiffs were, as they claim, denied a fair trial due to the purported misconduct of Jurors Donlon and Bunchuck during jury selection. In urging an affirmative answer to that question, defendants cite several cases for the unremarkable proposition that a high-low agreement is a contract governed by legal principles applicable to contracts generally. Absent from their submission, however, is any case akin to the present scenario, viz. a verdict in a amount which triggers a settlement agreement, but which was supposedly returned by an improperly selected, biased jury.

Acceptance of the rationale underlying defendants' argument presumably would mean, by way of a hypothetical, that if a deliberating jury was provided with a newspaper article about the case being decided, chocked-full of inflammatory information theretofore unknown to the jury, a high-low agreement such as the one here would, <u>ipso</u> <u>facto</u>, divest a party of "standing" to challenge the resulting verdict even if the contracting parties never considered the possibility of "extraneous prejudicial information" being provided to the deliberating jury. Fed. R.

Evid. 606(b).[3] Such a conclusion would be nigh impossible to square with public policy considerations geared to protecting the right of litigants to have their disputes resolved by a fair and impartial trier-of-fact.

Based on the submissions of counsel, including the dearth of authority provided on point, I decline to conclude that the above policy considerations are inapplicable to the present dispute. Although the parties could have agreed to a settlement with sufficient breadth to cover plaintiffs' current claim, the record is barren of any information suggesting they did so. Instead, it appears that their agreement implicitly presupposed a verdict rendered by an appropriately selected jury. Simply put, plaintiffs' allegations, <u>if</u> proven, were not part of the parties' agreement and, thus, are not trumped by the settlement agreement.

In sum, it has been concluded thus far that (1) the high-low agreement constituted a conditional settlement, with the condition being satisfied via the jury's verdict in favor of Jeffrey Leibstein in the amount of $125,400.00, and (2) that the agreement did not embrace the possibility of a fundamentally flawed jury returning that verdict and thus the settlement and verdict do preclude plaintiffs' application for a new trial.

---

[3] Although jurors are generally prohibited from attacking their verdict under Rule 606(b), an exception to the Rule permits such testimony if the basis for the attack is that prejudicial extraneous information was injected into the deliberative process.

Accordingly, at this juncture, the Court will focus on the materials furnished by movants in support of their application for a new trial or, alternatively for a hearing, to determine whether those materials are sufficient to grant either prong of the requested relief.

2.  Materials Furnished by Movant in Support of Application for a New Trial or, Alternatively, for a Hearing[4]

Defendants characterize the statements made in Elena Leibstein's affidavit as "double-hearsay." (Defs.' Mem. in Opp'n at 1.) In reviewing paragraphs 4, 5, and 6 of her December 2, 2010 affidavit, previously quoted, it is unclear to me whether the information provided is hearsay or double hearsay in that it is unclear whether she had conversations directly with Jurors Donlon and Bunchuck, or whether another juror or jurors, unnamed, stated what those individuals said "during the deliberations." Affidavit of Elena Leibstein at ¶ 4. That lack of clarity is remedied, however, in plaintiffs' Memorandum of Law in which it is explained that the two plaintiffs "[a]fter the verdict and the discharge of the jury" spoke to "four jurors" one or more of whom relayed what Donlon and Bunchuck supposedly said "during

---

[4] Although the Notice of Motion identifies the relief sought as "an order setting aside the verdict and granting a new trial," plaintiffs are initially seeking "a hearing, preceded by or including sworn testimony by these two jurors [viz. Donlon and Bunchuck] so that the Court can obtain more complete and direct evidence of their non-disclosure and, if confirmed," order a new trial. (Pls.' Mem. at 7-8.)

deliberations that were not disclosed in voir dire."  (Pls.' Mem. at 3-4.)  Therefore, the information provided by movants concerning those two jurors constitutes double hearsay. Similarly, the statements made by plaintiffs' counsel in his affidavit about Juror Bunchuck's supposed role during deliberations in leading the jury to a unanimous verdict represent at least double hearsay.[5]  (See Dec. 21, 2010 Dankner Reply Aff. at ¶ 6 ("I am advised that this happened [i.e., reaching a unanimous verdict] because the other jurors agreed to a 'non-negotiable compromise' ordered by Mr. Bunchuck, who insisted upon awarding no future damages and a finding of 40% comparative negligence against Mr. Leibstein and no more than $125,000.00 being awarded to him.")).  In any event, and setting aside for the moment the strictures of Fed. R. of Evid. 606(b) as to the type of testimony that may be proffered in attacking the validity of a verdict, it is clear that the present application rests on at least double hearsay relayed to the Court via one of the plaintiffs and her counsel.[6]

---

[5] Absent from counsel's December 21, 2010 affidavit is an indication that he spoke to any of the jurors post-verdict, or was present during any such conversation.  In Elena Leibstein's December 2, 2010 affidavit, she reports that she and her husband spoke with four of the jurors without suggesting that their attorney was also present.  (See Dec. 2, 2010 E. Leibstein Aff. at ¶ 4.)  Therefore the juror information provided by counsel apparently constitutes triple hearsay.

[6] The Court's use of the word "relayed" is not meant to imply that I suspect that either Elena Leibstein or her counsel

3. **Materials Furnished by Movant are Insufficient to Justify the Relief Requested**

The question arises whether the materials furnished by the movants are sufficient to warrant setting aside the verdict or, alternatively, conducting a hearing during which, or prior thereto Jurors Donlon and Bunchuck would be examined under oath.

Before addressing that question, it warrants mention that Fed. R. of Evid. 606(b) provides that "[u]pon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations . . . ." Fed. R. of Evid. 606(b). Query: Does Rule 606(b) preclude a juror – such as those who spoke to Elena Leibstein – from testifying about supposed misconduct by another juror learned during jury deliberations? That question does not lend itself to a simple answer, for there is a split among the Circuits on this point. Compare, e.g., Hard v. Burlington Northern R.R., 812 F.2d 482, 485 (9th Cir. 1987)(Ninth Circuit held that "[s]tatements [offered in support of an application for a new trial] which tend to show deceit during voir dire are not barred by [Rule 606(b)])" with (1)

---

has reported anything other that each believes to be correct. I don't. But common experience tells me that an event personally perceived and reported by one person may be transformed upon re-tellings to the extent that the original and final reports may be markedly different. And an interested party in that informational chain may enhance that possibility, unwittingly or otherwise.

Williams v. Price, 343 F.3d 223 (3d Cir. 2003) in which then-Judge Alito opined that the Ninth Circuit decision in Hard "appears [to be] inconsistent with Fed. R. of Evid. 606(b)," id. at 236, n.5, and (2) United States v. Benally, 546 F.3d 1230, 1235-36, 1239-41 (10th Cir. 2008). In any event, the question of whether the jurors who spoke to Elena Leibstein, or Jurors Donlon and Bunchuck, would be competent to testify in support of the relief requested need not be resolved, since the information provided by the movants is insufficient as a matter of law, as more fully explained infra, to warrant either a new trial, or a hearing "so that the Court can obtain more complete and direct evidence of [Donlon's and Bunchuck's] non-disclosure." (Pls.' Mem. at 7-8.) Initially, the materials furnished will be considered with respect to the application for a new trial, and then vis-a-vis the alternate request for a hearing.

Relatively short shrift may be made of plaintiffs' application for a new trial. To prevail on that application, plaintiffs are required to "satisfy a two-part test. First, [they] must show that 'a juror failed to answer honestly a material question on voir dire.' Second, [they] must show that 'a correct response would have provided a valid basis for a challenge for cause.' Both prongs must be met before a new trial may be obtained." United States v. Greer, 285 F.3d 158, 170 (2d Cir. 2000)(internal cites deleted)(quoting McDonough Power

Equipment v. Greenwood, 464 U.S. 548, 554 (1984)).[7]

With respect to the statement that Bunchuck "had been or was a defendant in a civil case," that statement obviously falls short of establishing either, but particularly the second of the two McDonough prongs and thus no further discussion is required.

The same may not be said of Elena Leibstein's statement about Donlon to the extent it does require further discussion. As earlier noted, she reported that an unnamed juror told her that Donlon, during deliberations, said that a member of his family had been burned while using a portland cement product. Plaintiffs argue that had that information been disclosed during voir dire, "there would have been further inquiry and a challenge for cause. Moreover, if denied, Mr. Donlon would have been excused via a peremptory challenge." (Pls.' Mem. of Law at 4.) That is so, the argument continues, because "[m]ost probably, this person did not bring a lawsuit or receive any compensation" and, accordingly, Donlon was unsympathetic to plaintiffs' claims. (Id.) Such speculation aside, had that information been provided during voir dire surely additional questions would have been

---

[7] Parenthetically, the significant hurdles to obtaining a new trial – even in, unlike here, a criminal context – is evidenced by the fact that a judge of the Southern District of New York indicated in 2004 that as of that time "no verdict in the Second Circuit has been overturned on the basis of juror non-disclosure under the McDonough test." United States v. Stuart, 317 F. Supp. 2d 432, 436-37 (S.D.N.Y. 2004).

asked of Donlon.  Nonetheless, and again returning to the
question of whether the information provided by plaintiffs on its
face warrants a new trial, the answer to that question is "no."
It was undisputed at trial that an improper use of portland
cement could cause burns.  That was not an issue.  Rather, the
crux of the liability dispute was whether the packages of
portland cement plaintiff Jeffrey Leibstein purchased at Home
Depot contained adequate warnings of that hazard.  In sum, as is
true of Bunchuck, a juxtapositioning of what Elena Leibstein
reports about Donlon with the McDonough standard indicates that
the movants have not furnished sufficient information to justify
a new trial.

How about plaintiffs' alternate request that two or
more of the jurors be disposed by counsel and/or called to attend
a hearing before me?  Such post-verdict discovery, plaintiffs
implicitly posit, would provide a simple mechanism to address
their concerns.  Answers could be obtained as to whether Donlon
made the statement under discussion and, if so, what was the
nature of his relationship with the family member said to be
burned?  Was he or she an immediate or distant family member?
What type burns were sustained, and when did the accident happen?
Was Donlon's failure to provide the information inadvertent or
intentional?  Presumably these are the type of questions
plaintiffs' counsel would like to ask of Donlon.

However, to recall two or more of the jurors for post-verdict discovery, particularly on the sketchy, second-and third-hand information provided by plaintiffs, cannot be reconciled with established Second Circuit law which seeks, subject to some exceptions not applicable here, to insulate jurors from "post-verdict inquiries [and the concomitant risk of] subjecting jurors to harassment, inhibiting juryroom deliberations, burdening courts with meritless applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." <u>United States v. Ianniello</u>, 866 F.2d 540, 543 (2d Cir. 1989). "[C]ourts are, and should be, hesitant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences." <u>United States v. Moon</u>, 718 F.2d 1210, 1234 (2d Cir. 1983). "[A] post-trial evidentiary hearing into alleged juror misconduct [including the failure of a juror to disclose information during <u>voir dire</u>] is required only when a party comes forward with 'clear, strong, substantial and incontrovertible evidence . . . that is a specific, non-speculative impropriety has occurred.'" <u>United States v. Sattar</u>, 395 F. Supp. 2d 66, 72 (S.D.N.Y. 2005), quoting from <u>Ianniello</u>, 866 F.2d at 543. Plaintiffs' proffer fails to satisfy that stand. And to the extent the present application calls my discretion into play, I disagree with plaintiffs' position that the verdict, including the jury's

-17-

failure to award future damages, underscores the purported unfairness of the proceedings and the need for a hearing. In my view, the verdict fits comfortably within the realm of reasonableness based on the trial evidence and recognizing the jury's obligation to make credibility determinations.

## CONCLUSION

The high-low agreement reached by the parties during jury deliberations, as explained on the record by counsel, constituted a settlement agreement which covered, by its atypical terms, the jury's intra-bracket verdict. Nonetheless, that agreement would not preclude plaintiffs' Rule 59 application for a new trial, had plaintiffs demonstrated that the verdict in favor of Jeffrey Leibstein was the product of juror misconduct during voir dire. But plaintiffs' effort in that regard, based on second and third level hearsay, is simply too thin a reed for the Court to either order a new trial or, alternatively, a post-verdict deposition and/or hearing of one or more of the jurors concerning the alleged improprieties during voir dire.

For the reasons provided, plaintiffs Rule 59 motion is denied in toto.

SO ORDERED.

Central Islip, New York
February 14, 2011

_____/S/_____
DENIS R. HURLEY, U.S.D.J.